## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GUENTHER MARTENS, LYNNE ) | |
| MARTENS, PETER T. MCARDLE ) | |
| and ROSEMARY MCARDLE, ) | Civil Action No. 2:06-CV-737 |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | The Honorable Arthur J. Schwab |
| ) | |
| ARIANA & NATHANIEL ) | |
| CONTRACTING, INC., THE HOME ) | |
| SHOW-MORGANTOWN, INC., ) | |
| JAMES S. TAYLOR, an individual, ) | |
| O.C. CLUSS CO., TREMCO BARRIER ) | |
| SOLUTIONS, BB&T OF WEST ) | |
| VIRGINIA, CMH HODGENVILLE, ) | |
| INC. d/b/a CLAYTON HODGENVILLE, ) | |
| CARPENTER EXCAVATING AND ) | |
| GRADING, LLC, and S&S MOBILE ) | |
| HOME TRANSPORTING, ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION OF THE SPECIAL MASTER
## CONCERNING MOTIONS FOR SUMMARY JUDGMENT

Before the Special Master are the motions for summary judgment filed by defendants The

Home Show-Morgantown, Inc. ("Home Show"), O.C. Cluss Company ("Cluss"), Tremco Barrier

Solutions ("Tremco"), CMH Hodgenville, Inc. d/b/a Clayton Hodgenville ("Clayton"), and

Carpenter Excavating & Grading, LLC ("Carpenter"). After consideration of the arguments of

the parties and the evidence of record, the Special Master hereby issues the following Report and

Recommendation to the United States District Court for the Western District of Pennsylvania.

## I. INTRODUCTION AND BACKGROUND

In 2004, Guenther and Lynne Martens began residing in the single family home in New

Salem, Fayette County, Pennsylvania of Ms. Martens' aging parents, Peter and Rosemary

McArdle, to assist in their care. Having found themselves in need of a larger living space, the Plaintiffs decided to purchase a manufactured home. After visiting the Home Show in Morgantown, West Virginia several times, allegedly in response to advertising, they began negotiations to purchase a new manufactured home in June of 2004.

On September 24, 2004, Plaintiffs entered into a written agreement with the Home Show for the purchase of a manufactured home. Defendant Clayton manufactured the home at issue before it was delivered to the Plaintiffs. On December 21, 2004, the Plaintiffs contracted with defendants James Taylor ("Taylor"), principal, and Ariana & Nathaniel Contracting, Inc. ("A&N"), for the installation of the home, which included excavating the site, constructing the foundation and concrete basement floor, installing French drains along the foundation, waterproofing the foundation walls, backfilling the foundation, installing the support beams and post jacks, and building the ramp to assist in connecting the two pieces of the home at the "marriage joint." Plaintiffs contracted with defendant S&S Mobile Home Transporting to transport the manufactured home from Clayton in two separate pieces to the Plaintiffs' land, set the home onto the foundation and connect the two pieces of the home at the "marriage joint."

A&N subcontracted with defendant Carpenter to excavate the foundation, which more specifically required Carpenter to clear the installation site, dig holes for the foundation, footers, basement and utility lines, place stone over the drains, and backfill and grade dirt around the foundation after its construction. A&N also subcontracted with defendant Cluss to apply a waterproofing system to the foundation walls. On April 1, 2005, Cluss applied TUFF-N-DRI® membrane to the foundation walls and then applied WARM-N-DRI® foundation board to the walls; both products were manufactured by defendant Tremco.

Plaintiffs began residing in the home around May of 2005. Since then, Plaintiffs allege to have experienced the following:

(1)    cracking of the basement floor excavated by Carpenter and poured by Taylor and A&N;

(2)    cracking of the foundation walls excavated by Carpenter and laid by Taylor and A&N, both through the mortar and through individual concrete block;

(3)    separation of the "marriage seam" which binds the two halves of the structure together due to the shoddy workmanship of S&S;

(4)    water leakage into the basement;

(5)    twisting and cracking of the interior walls of the manufactured home;

(6)    excessive pressure on and exposure of gas, water and electric lines;

(7)    improper and inadequate function of doors and windows;

(8)    excessive floor vibration during operation of laundry appliances; and

(9)    loose and poorly fitted siding and soffit and fascia.

3d Am. Compl. at ¶ 32.

Plaintiffs commenced a civil action against the above-named defendants in the Court of Common Pleas of Fayette County, Pennsylvania on April 20, 2006. A notice of removal was filed on June 6, 2006. Plaintiffs filed a Third Amended Complaint on November 29, 2006, asserting the same five causes of action against all defendants: Count I – Breach of UCC Implied Warranty of Merchantability; Count II – Breach of Warranty on New Home; Count III – Violations of the Magnuson Moss Warranty Act; Count IV – Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201.1; and Count V – Fraud/Constructive Fraud/Punitive Damages.

This matter was originally referred to the undersigned as Special Master by Order of Court dated August 1, 2006. Thereafter, by Order of Court dated October 31, 2007, the District Court directed the Special Master to hear and resolve the pending motions for summary judgment and issue a Report and Recommendation regarding the same. For the reasons set forth below, we recommend that the motions for summary judgment filed by the Home Show and Clayton be granted on Plaintiffs' claims and all cross-claims, except that Clayton's request for counsel fees and costs be denied; the motions for summary judgment filed by Cluss and Tremco be denied on all claims and cross-claims; and the motion for summary judgment filed by Carpenter be granted in part and denied in part with respect to Plaintiffs' claims and denied on the cross-claims of Cluss and Tremco.

## II.    LEGAL STANDARD

Summary judgment may be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, we must examine the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the initial burden of identifying the basis of the motion and the evidence which demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Then, in order to avoid summary judgment, the non-moving party must produce evidence sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial, such that a reasonable fact-finder could find for said party. *Anderson*, 477 U.S. at 248-49.

# III. ANALYSIS

## A. THE HOME SHOW AND CLAYTON

### 1. Plaintiffs' Claims

The Home Show and Clayton contend that Plaintiffs' claims arising out of the construction and safety of the manufactured home are preempted by the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. §§ 5401-5426, and its attendant regulations, and that Plaintiffs have failed to present any evidence that their manufactured home failed to comply with any federal standard or regulation. The Home Show and Clayton further argue that Plaintiffs have failed to present evidence to support any breach of express or implied warranties, which warranted that the manufactured home would comply with said federal standards and regulations. According to the Home Show and Clayton, Plaintiffs have produced no evidence to support their claims that the manufactured home is not merchantable, was below acceptable standards, unsafe or otherwise uninhabitable due to the alleged defects. Similarly, the Home Show and Clayton contend that Plaintiffs have failed to present any evidence in support of their claims under the UTPCPL and fraud.[1]

Plaintiffs respond by asserting that the preemption argument is irrelevant because they have not alleged a violation of any federal, state or local standards, statutes or regulations regarding manufactured homes and that genuine issues of material fact exist whether the Home Show and Clayton complied with the express and implied warranties and whether the quality of the manufactured home was misrepresented so as to support their UTPCPL and fraud claims.

---

[1] The Home Show and Clayton also argue that Pennsylvania statutory law should not apply to the facts, that the "gist of the action" doctrine bars Plaintiffs' fraud claim and further, that there is no separate cause of action for punitive damages and no evidence of malicious conduct in any event. We do not address these arguments because we find no evidence of record to support Plaintiffs' UTPCPL and fraud claims against these defendants.

We begin by examining the language of the express warranty provided in the Owners and Installation Manual with Limited Warranty and Arbitration Agreement for Multi-Sectional Homes ("Owners and Installation Manual"), which provides in relevant part:

> The Manufacturer warrants that your new home has been constructed to *meet or exceed all applicable governmental requirements, and* that the *home*, including the structure, plumbing, heating and electrical systems, and all appliances and equipment installed by the Manufacturer, *is free under normal use from manufacturing defects in material or workmanship.* This warranty begins on the date of the original retail delivery (or the date of first occupancy, if used as a commercial unit) and extends for a period of one (1) year from such date. All cosmetic deficiencies in the home should be identified immediately following installation of the home. []

> The warranty covers only those defects which become evident within the applicable warranty period and where written notice is provided to the Retailer or Manufacturer not later than fifteen (15) days after the expiration of such warranty period. []

> THIS WARRANTY DOES NOT COVER:

> 1. Any home registered or located outside the United States.

> 2. Problems resulting from failure to comply with instructions contained in the owner's installation manual.

> 3. Bedding, draperies, furniture, tires, wheels or axles.

> 4. Appliances or accessories provided or installed by the retailer or a third party.

> 5. Defects or problems caused by or related to:

> A. Improper soil conditions, site preparation, installation or ventilation at the retail purchaser's site, resulting in water or other damage.

> B. Use in the home of a kerosene heater or other type of fuel-burning portable heater.

> C. Abuse, misuse, negligence or accident.

> D. Alteration or modification of the home.

> E.  Normal deterioration due to wear or
exposure.

> Loss of time, inconvenience, commercial loss, loss of use of the
> home, incidental charges such as telephone calls, hotel bills or
> other incidental or consequential damages.  Some states do not
> allow the exclusion or limitation of incidental or consequential
> damages, so the above limitation may not apply to you.

> ALL IMPLIED WARRANTIES, INCLUDING ANY IMPLIED
> WARRANTY OR (sic) MERCHANTABLITY, HABITABILITY
> OR FITNESS FOR A PARTICULAR PURPOSE APPLICABLE
> TO THE ITEMS OR COMPONENTS COVERED BY THE
> LIMITED ONE-YEAR EXPRESS WARRANTY ARE LIMITED
> IN DURATION TO THE TERM OF SUCH LIMITED
> WARRANTY. []

Owners and Installation Manual, Section 5, pages 26-27 (emphasis added).[2]  By its plain terms,

the foregoing express one-year limited warranty entitled Plaintiffs to a manufactured home that

*meets or exceeds* all applicable governmental requirements *and* that is free under normal use

from manufacturing defects in material or workmanship.

With respect to the preemption argument, the Supreme Court has held that federal law

preempts state law in three circumstances.  *See English v. General Elec. Co.*, 496 U.S. 72, 78-79

(1990).  First, Congress can define explicitly the extent to which its enactments preempt state

law.  Second, in the absence of explicit statutory language, state law is preempted where it

regulates conduct in a field that Congress intended the federal government to occupy

exclusively; such intent may be inferred from, *inter alia*, a scheme of federal regulation so

pervasive as to make reasonable the inference that Congress left no room for the states to

supplement it; if express, Congress' intent must be clear and manifest.  Third, state law is

preempted to the extent that it actually conflicts with federal law; in other words, where it is

---

[2] The implied warranty of merchantability may be excluded or modified in writing by conspicuous language that
mentions merchantability. *See* 13 Pa. C.S.A. § 2316.  Plaintiffs do not challenge the validity of the limitation on the
implied warranties as defined by the express one-year limited warranty.

impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See English*, 496 U.S. at 78-79.

The National Manufactured Housing Construction and Safety Standards Act of 1974 ("Manufactured Housing Act") contains a preemption provision which states in relevant part:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403(d). However, the Manufactured Housing Act also contains a savings provision which states, "[c]ompliance with any Federal manufactured home construction and safety standard issued under this chapter does not exempt any person from any liability under common law." 42 U.S.C. § 5409(c). We find persuasive and adopt the reasoning of the Supreme Court in *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), which considered the effect of a nearly identical savings clause provision in another statute, and held that, reading the preemption provision and the savings clause together, the preemption provision was meant expressly to preempt only state statutes and regulations, not common law actions. *See Geier*, 529 U.S. at 868; *see also Choate v. Champion Home Builders Co.*, 222 F.3d 788, 794 (10th Cir. 2000) (holding, in light of *Geier*, that a products liability claim was not expressly preempted by the Manufactured Housing Act); *Shorter v. Champion Home Builders Co.*, 776 F.Supp. 333, 338 (N.D. Ohio 1991) (finding that plaintiff's state law tort claim is not preempted by the Manufactured Housing Act; the federal standard will be treated as one piece of evidence going toward the issue of design defect). Further, the savings clause also preserves those actions that

seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor. *See Choate*, 222 F.3d at 794; *see e.g.,* 24 C.F.R. § 3280.303(a) ("The manufacturer or installer may exceed these standards[.]"). As such, we conclude that Plaintiffs' common law claims are not expressly preempted by the Manufactured Housing Act.

With respect to implied preemption, we note that the Manufactured Housing Act does not support an assertion that Congress intended for the federal government to occupy the field of construction and safety of manufactured homes exclusively. *See Choate*, 222 F.3d at 795. As rehearsed, conflict preemption exists when (1) it is impossible for a private party to comply with both state and federal requirements or (2) when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.* We find that it is not impossible to comply with both the Manufactured Housing Act standards and the common law standards governing breach of warranties under the facts of the instant case.

Plaintiffs' theory of liability against the Home Show and Clayton is based on the allegations that the manufactured home is not sufficiently free from structural defects; does not pass without objection in the trade; is not fit for its ordinary purpose, habitation; and is unsafe, grossly unsuitable and severely damaged. *See* 3d Am. Compl. at ¶¶ 37-39, ¶¶ 48-49, ¶ 51, ¶ 62. The Regulations governing the body and frame construction requirements of the manufactured home provide "minimum requirements for materials, products, equipment and workmanship needed to assure that the manufactured home will provide: (a) structural strength and rigidity[.]" 24 C.F.R. § 3280.301. The Regulations further state that "[a]ll construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades." 24 C.F.R. § 3280.303(b). The Regulations provide the following relevant definitions:

"Defect" means a failure to comply with an applicable Federal manufactured home safety and construction standard that renders the manufactured home or any part or component thereof not fit for the ordinary use for which it was intended, but does not result in an unreasonable risk of injury or death to occupants of the affected manufactured home.

"Imminent safety hazard" means a hazard that presents an imminent and unreasonable risk of death or severe personal injury that may or may not be related to failure to comply with an applicable Federal manufactured home construction or safety standard.

"Noncompliance" means a failure of a manufactured home to comply with a Federal manufactured home construction or safety standard that does not constitute a defect, serious defect, or imminent safety hazard.

"Serious defect" means any failure to comply with an applicable Federal manufactured home construction and safety standard that renders the manufactured home or any part thereof not fit for the ordinary use for which it was intended and which results in an unreasonable risk of injury or death to occupants of the affected manufactured home.

24 C.F.R. § 3282.7 (j), (p), (x), (ff). Similarly, in order to prove that the home was not

"merchantable" under state law, Plaintiffs must prove the home does not pass without objection

in the trade under the contract description and/or is not fit for the ordinary purposes for which

such homes are used. *See* 13 Pa. C.S.A. § 2314(b)(1), (3).

Although we find that Plaintiffs claims are not preempted, we nevertheless recommend

that summary judgment be granted in favor of the Home Show and Clatyon because the record

does not contain evidence showing a genuine issue of material fact that the manufactured home

is not sufficiently free from structural defects; does not pass without objection in the trade; is not

fit for its ordinary purpose, habitation; or is unsafe, grossly unsuitable or severely damaged. To

support their claims, Plaintiffs retained two experts: Daniel F. Grieco, Jr.[3] and Daniel F. Lynch. First, with the Martens and Plaintiffs' Counsel present, Mr. Grieco performed a visual inspection of the home on July 19, 2006. (Grieco Dep. at 10, 109). He provided an expert report explaining the results of the inspection with photographs attached.

In his report, Mr. Grieco summarized Plaintiffs' complaints regarding the exterior of the home as follows: poor fit and finish of vinyl siding (gaps) and displeasure with the grading of the rear yard, which allegedly caused groundwater infiltration into the basement. With respect to the interior of the home, Mr. Grieco observed hairline curing shrinkage cracks throughout the basement concrete floor; cracks, hairline cracks and step cracks throughout the foundation wall; a rusted frame; a wide gap and misalignment in the "marriage joint" (Plaintiffs tried to fill the gap) with un-centered thin steel plates atop screw posts along the marriage joint; staircase out-of-square, causing steps to lean; jagged hairline tension cracks above door frames; poor miter joint fit throughout the home; poor drywall finish in corners; walls and doors out-of-square and out-of-plumb; vibration of laundry room floor when washer in use; warped doors; visible "marriage joint" in ceiling; and uneven "marriage joint" in floor, with loose carpet.[4]

At his deposition, Mr. Grieco conceded that he was not familiar with the Manufactured Housing Act or the definitions of defect, imminent safety hazard, noncompliance or serious defect as set forth in the regulations. (Grieco Dep. at 112-13). Mr. Grieco admitted that he does not know what standards are applicable to the manufactured home at issue; he was never trained with respect to the standards of manufactured homes and further conceded that he does not

---

[3] Clayton contends that Mr. Grieco's testimony is inadmissible under Rule 702. We do not address this argument in light of our finding that the record does not contain evidence to support the claims against the Home Show or Clayton.
[4] We note that it is undisputed that most of these complaints involve work performed by other parties who have not moved for summary judgment, namely, A&N Contracting and S&S Mobile Transporting. As such, we will not address the alleged problems with the basement floor, foundation wall cracks, or the misaligned "marriage joint" and the related problems caused by such misalignment.

consider himself to be an expert in manufactured homes. (Grieco Dep. at 134, 136, 144-45). Mr. Grieco explained that he does not opine that the conditions noted in his report concerning the upstairs of the home are "defective or substandard; [he] simply explained why they were there." (Grieco Dep. at 145-46).

Mr. Grieco agreed that the wall cracks are not a safety hazard; they do not create an unreasonable risk of injury or death or evidence a risk of collapse. (Grieco Dep. at 126). Mr. Grieco conceded that he does not know whether the cracks would be considered a defect under the federal standards and regulations. (Grieco Dep. at 126). Similarly, Mr. Grieco could not opine whether the miter joint gaps would constitute a violation of federal standards and regulations but acknowledged that he does not consider the gaps to create a danger. (Grieco Dep. at 128). Mr. Grieco further explained, "[t]he claimants are making lots of quality complaints. Some of the quality issues are things such as walls and ceilings not being square or linear, door problems, handle problems, and a few of these minor cracks." (Grieco Dep. at 145). Mr. Grieco acknowledged that he did not use a level or plum bob to confirm that the walls were "slightly" out of plumb because he could observe the condition visually without such tools; and he was not offering an opinion that such condition was substandard under applicable standards. (Grieco Dep. at 129, 144).

Like Mr. Grieco, Plaintiffs' other expert, Mr. Daniel F. Lynch, admitted that he does not know what a manufactured home is as that term is defined by the government; has no knowledge of the standards that are applicable to manufactured homes and has no expertise regarding the design of a manufactured home. (Lynch Dep. at 113). As such, Mr. Lynch conceded that he cannot provide any opinion testimony regarding whether or not the Plaintiffs' home meets the controlling standards. (Lynch Dep. at 114). Mr. Lynch further acknowledged that he has not

assigned any responsibility for any of the alleged issues with the home to Clayton. (Lynch Dep. at 114). Finally, he agreed that his reports only reference the cost to repair certain items but do not contain an opinion as to the actual need to perform such repairs. (Lynch Dep. at 114). Mr. Lynch admitted that he did not read the entire installation manual or the warranty language covering Plaintiffs' home. (Lynch Dep. at 114).

On the other hand, Clayton's expert witness, David R. Tompos, a Professional Engineer and certified inspector with over thirty-five years experience in the mobile/modular home industry, visually inspected the home on December 19, 2006. In his report, Mr. Tompos opines that the manufactured home is in conformance with manufactured home construction and safety standards; that several of the items identified by Plaintiffs as "defects" are cosmetic and can be easily repaired; and that several items were the responsibility of the site contractor. Mr. Tompos also provided a supplemental report in response to the cost estimates of Mr. Lynch and again indicated that the conditions were created by the site contractor and thus not the responsibility of Clayton. Plaintiffs admit that they have failed to present expert testimony contrary to that of Mr. Tompos' opinion that the home complies with federal construction and safety standards. (See Joint Concise Statement of Undisputed Material Facts Supporting Motion for Summary Judgment of The Home Show, at ¶ 15.)

Based on the foregoing, we find that Plaintiffs have failed to produce evidence to establish a genuine issue of material fact that the manufactured home does not meet or exceed government standards; is not sufficiently free from structural defects; does not pass without objection in the trade; is not fit for its ordinary purpose, habitation; or is unsafe, grossly unsuitable or severely damaged. Plaintiffs have not presented contrary evidence to the opinion of Mr. Tompos that the home complies with all government standards, is fit for habitation and is

13

safe. Plaintiffs' experts do not opine that the home would not pass without objection in the trade and no other evidence has been offered by Plaintiffs to support this claim. Plaintiffs have been residing in the home since approximately May of 2005 and have not presented any evidence that the home is not fit for habitation. We finally note that the record supports that Clayton in fact undertook certain repairs within the warranty period and Plaintiffs have not claimed any deficiency in such repair efforts.

For these reasons, we recommend that the Home Show and Claytons' motions for summary judgment be granted on the claims for breach of express and implied warranties (Counts I and II). For the same reasons, summary judgment also should be granted in favor of the Home Show and Clayton on Plaintiffs' claims under the Magnuson Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*,[5] (Count III), which supplements state implied warranty law. *See Huegel v. Mifflin Const. Co., Inc.*, 796 A.2d 350, 358 (Pa. Super. 2002) (citing *Richardson v. Palm Harbor Homes, Inc.*, 254 F.3d 1321, 1325 (11th Cir. 2001)).

With respect to Plaintiffs' claims under the UTPCPL and fraud, we note that the purpose of the UTPCPL is to protect consumers of goods and services from unfair or deceptive business practices and fraud. *See Pirozzi v. Penske Olds-Cadillac-GMC, Inc.*, 605 A.2d 373, 375 (Pa. Super. 1992). In Pennsylvania, an action for fraud (or intentional misrepresentation) contains the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or with recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the

---

[5] We also find merit to the Home Show and Clayton's argument that a manufactured home is not a "consumer product" which is defined as tangible personal property which is normally used for personal, family or household purposes as set forth in the Magnuson Moss Act and accompanying regulations. *See Kravitz v. Homeowners Warranty Corp.*, 542 F. Supp. 317, 321 (E.D. Pa. 1982) (quoting 16 C.F.R. § 700.1 (e), (f)).

misrepresentation; (6) injury resulting and proximately caused by the reliance. *See Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994).

Plaintiffs have failed to present any evidence to create a genuine issue of material fact that the Home Show and/or Clayton engaged in unfair or deceptive business practices or any other conduct constituting fraud. Other than Plaintiffs' allegations in the Third Amended Complaint, there is no evidence of record to support that the Home Show and/or Clayton engaged in any of the alleged enumerated acts of unlawful conduct set forth in the UTPCPL. *See* 3d Am. Compl. at ¶ 59 (citing 73 P.S. § 201-2 (4)(ii) (causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services); (v) (representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have); (vii) (representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are another); (ix) (advertising goods or services with intent not to sell them as advertised); (xiv) (failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made); (xvi) (making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing); and (xxi) (engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding). As such, we recommend that the Home Show and Clayton's motion for summary judgment on Counts IV and V of the Third Amended Complaint be granted. For the foregoing reasons, we recommend that the District Court grant the Home Show and Clayton's motions for summary judgment on all counts in the Third Amended Complaint and all cross-claims.

2.    Arbitration Clauses

Clayton contends that Plaintiffs are bound by an arbitration clause contained in the Owners and Installation Manual and, by their failure to voluntarily dismiss all claims and pursue them in binding arbitration, Plaintiffs are liable for all of Clayton's costs and attorney fees incurred in defending this action to date.

The arbitration clause in the Owners and Installation Manual provides in relevant part:

> If any party fails or refuses to arbitrate in accordance with the terms of this agreement, the arbitrator(s) shall, in addition to any other relief awarded through arbitration, tax all of the costs, including reasonable attorneys' fees, in favor of the party seeking to enforce arbitration *if* that party has to resort to judicial or other means *to compel* arbitration.

Owners and Installation Manual, Section 5, page 27 (emphasis added). While Clayton requested Plaintiffs' counsel to dismiss all claims and pursue binding arbitration via letter dated January 8, 2007, Clayton has not resorted to judicial or other means *to compel* arbitration by, for example, filing a motion to compel arbitration or otherwise challenging the subject matter jurisdiction of the District Court. Instead, Clayton defended this action on its merits to the present summary judgment stage.

Similarly, the arbitration clause contained in the Arbitration, Responsibility and Installation Form provides that:

> If either Dealer or Buyer brings any other action for judicial relief with respect to any dispute as referred to above, the party bringing such action will be liable for and immediately pay all of the other party's costs and expenses, including attorney's fees incurred *to stay or dismiss* such action in enforcing this agreement, *and getting the dispute referred to arbitration.*

Arbitration, Responsibility and Installation Form, page 3 (emphasis added). Again, Clayton never moved to stay or dismiss this action. This form also specifically states, "Not Valid Unless Signed by an Officer or Manager of the Company," and we find merit to Plaintiffs argument that

the failure of the Home Show and/or Clayton to sign the form renders the arbitration clause invalid and unenforceable. For these reasons, we recommend that Clayton's request for costs and attorneys fees be denied.

B.    CLUSS, TREMCO and CARPENTER

Cluss and Tremco contend that summary judgment should be granted on Plaintiffs' warranty claims because Plaintiffs have failed to produce any evidence that establishes that the waterproofing product or its application to the foundation walls was defective. In support of this argument, Cluss and Tremco indicate that neither of Plaintiffs' experts opines that the alleged deficiencies in the home are attributable to the acts of Cluss or Tremco. These defendants further argue that the deficiencies alleged by Plaintiffs would invalidate the warranty that Tremco provided with the TUFF-N-DRI® product, namely, the improper grading, the downspout improperly directing water toward the foundation, and the improperly functioning foundation drains. Finally, Cluss and Tremco contend that Plaintiffs have failed to present any evidence in support of their claims under the UTPCPL and fraud.

Plaintiffs respond by asserting that genuine issues of material fact exist with respect to whether the waterproofing system is defective. Plaintiffs concede that "while it is correct that neither of Plaintiffs' experts opined as to the waterproofing, Plaintiffs' testimony as to the ongoing water problem, supported by the Dozzi Report clearly presents a genuine issue of material fact for the fact-finder." Plaintiffs rely on the expert report of Victor D. Dozzi, P.E., who was retained by defendant Carpenter, and saw damp areas on the inside of the rear wall of the basement, concluding that "[t]he interior of the concrete block are damp because of the failure of the foundation drains and the waterproofing system applied to the walls." (Dozzi Report at page 5). Plaintiffs further argue that "there is a fundamental unreasonableness to

Cluss' and Tremco's interpretation of the warranty exclusions, exceptions and limitations" and that we should find them "illusory." Finally, Plaintiffs contend that genuine issues of material fact exist with respect to the alleged violations of the UTPCPL based on the representations regarding the quality of the waterproofing product and application which were guaranteed in writing for a period of years but failed because of the mere presence of water.

Carpenter contends[6] that summary judgment should be granted on Count I, "breach of UCC implied warranty of merchantability," because Section 2314 of the UCC (cited by Plaintiffs in the Third Amended Complaint) deals specifically with the sale of goods and does not govern any contract which is made for the provision of services. Carpenter notes that its contract with A&N specifically proclaimed that "no materials" were included. Carpenter contends that summary judgment should be granted on Count II because an implied warranty of habitability arises only by contract between the builder/vendor and purchaser of a new home, and there is no contract between Plaintiffs and Carpenter. Carpenter acknowledges that Plaintiffs may be asserting a claim for breach of the implied warranty of workmanlike construction, but contends that the claim fails because Plaintiffs have not produced expert testimony to support it.

Next, Carpenter argues that summary judgment should be granted on Count III because the Magnuson-Moss Act applies specifically and exclusively to express and implied warranties on "consumer products" which the Act defines as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed)." 15 U.S.C. § 2301. Since Carpenter only

---

[6] Carpenter initially argues that Plaintiffs have failed to produce expert testimony to establish that Carpenter was negligent or that its acts proximately caused Plaintiffs' damages. We note, however, that negligence principles have not been pled in the Third Amended Complaint. *See, e.g.*, 3d Am. Compl. at ¶ 22 (alleging that Carpenter failed to perform its excavation in accordance with its contractual specifications and with proper construction practices).

provided services in connection with the installation of the home, the Act simply does not apply. Finally, Carpenter contends that Plaintiffs have failed to present any evidence in support of their claims under the UTPCPL and fraud.

Plaintiffs argue that a genuine issue of material fact exists regarding the quality of workmanship provided by Carpenter in the performance of its obligations to excavate, backfill and grade the property and that the record in fact contains expert testimony on this issue. Plaintiffs contend that the work performed by Carpenter was an integral part of the manufactured home which justifies application of the Magnuson-Moss Warranty Act. Finally, Plaintiffs assert that their claim under the UTPCPL survives because Mr. Carpenter "represented" that he has been in the excavating business since 1952 and that the acts of Carpenter fall within the subsection pertaining to "making substandard repairs to real property." (Pls.'s Br. at 7).[7]

Based on the following evidence of record, we recommend that the motions for summary judgment filed by Cluss and Tremco be denied on all claims and cross-claims; and the motion for summary judgment filed by Carpenter be granted in part and denied in part with respect to Plaintiffs' claims and denied on the cross-claims of Cluss and Tremco. We recommend that summary judgment be granted in favor of Carpenter on Count I because the UCC, upon which Plaintiffs' claim is based, applies only to the sale of goods and it is undisputed that Carpenter did not sell goods to Plaintiffs. *See generally*, 13 Pa. C.S.A. § 2101 *et seq.* Similarly, we recommend that summary judgment be granted in favor of Carpenter on Count III because it did not provide a "consumer product," which is defined as tangible personal property which is normally used for personal, family or household purposes, as set forth in the Magnuson Moss Act and accompanying regulations. *See Kravitz v. Homeowners Warranty Corp.*, 542 F. Supp.

---

[7] We note that Plaintiffs do not address Carpenter's arguments with respect to Count I (breach of UCC implied warranty of merchantability) and Count V (fraud).

317, 321 (E.D. Pa. 1982) (quoting 16 C.F.R. § 700.1 (e), (f)). Finally, we recommend that summary judgment be granted in favor of Carpenter on Counts IV and V because Plaintiffs have not presented any evidence to support either claim for violations of the UTPCPL or fraud. Particularly, the subsection of the UTPCPL pertaining to repairs to real property applies when the repairs are "of a nature or quality inferior to or below the standard of that agreed to in writing." 73 P.S. § 201-2 (4)(xvi). Carpenter made no representations in writing to the Plaintiffs regarding the nature or quality of his work.

We find that genuine issues of material fact exist, however, with respect to the cause of the water infiltration into the basement, namely whether the waterproofing system and/or its installation was defective, whether the amount, type and manner of backfill were appropriate under the circumstances and performed in a workmanlike manner, whether Cluss and/or Tremco complied with the terms of the written warranty and whether the exceptions or exclusions of the TUFF-N-DRI® warranty apply.

1.    Installation of the Waterproofing System

On April 1, 2005, a representative of Cluss applied TUFF-N-DRI® membrane to the foundation walls and then applied WARM-N-DRI® foundation board to the walls; both products were manufactured by defendant Tremco. The TUFF-N-DRI® 20-year Limited Warranty provides in relevant part:

> Under normal use and service, the vertical surface of your
> foundation wall not obscured or covered by other building
> materials should be free of water leakage or seepage through the
> areas that are treated with TUFF-N-DRI® product ("Leakage"),
> EXCEPT FOR EXCEPTIONS, EXCLUSIONS AND
> LIMITATIONS SET FORTH BELOW. []
>
> This Warranty does not apply and [Tremco] has no responsibility
> for Leakage resulting from:

1.       Cracks or defects greater than 1/16', including structural defects in the walls, footings or foundation regardless of cause.

2.       Damage to the applied TUFF-N-DRI® System or to the walls to which it is applied.

3.       Improper drainage above, around or under the building or the foundation walls resulting from the following specified failure to either meet or exceed local construction codes or failure to meet or exceed good construction practices existing at the time of application of the TUFF-N-DRI® System:

       A.       Defective or inadequately functioning interior, exterior, or an interior/exterior foundation drainage system; or

       B.       Grading which does not slope away from the structure sufficiently to drain water away from the structure or which results in a grade line extending above the TUFF-N-DRI® System that allows water to penetrate above the TUFF-N-DRI® System; or

       C.       Insufficient hydrostatic resistance at the exterior base of the foundation walls and across any floor within the foundation walls that allows water migration through joints where the floor meets the walls or into the structure through basement floors or drains; or

       D.       Defective or inadequately functioning gutters or downspouts.

4.       Condensation on the foundation walls or interior finish.

5.       Openings for pipes, cables, ducts and other intrusions into or alterations of the waterproofed walls made after application of the TUFF-N-DRI® System.

6.       Application of the TUFF-N-DRI® System by a contractor other than a Tremco Barrier Solutions Contractor.

7.       The use of expansion or contraction devices in the design of the wall's structure.

8.       Any construction technique used by a builder or subcontractor that allows water to enter above, below or behind the TUFF-N-DRI® System.

(Tremco 20-Year Limited Warranty).

With respect to the proper application of the TUFF-N-DRI® system, Todd Messenger, a Technical Service Representative with Tremco, explained that the surfaces to which the TUFF-N-DRI® membrane is applied should be smooth, clean and free of dust, mud, dirt, loose mortar, and any other substances which might prevent the adhesion and bonding of the product to the foundation. (Messenger Dep. at 32-33). A contractor who fails to clean the surfaces would be failing to follow Tremco's specifications. (Messenger Dep. at 33). With respect to training in the application of the TUFF-N-DRI® system, Mr. Messenger explained that Tremco provides training and detailed installation instructions to companies that install their TUFF-N-DRI® product. (Messenger Dep. at 25, 30). Mr. Messenger was unaware of the person who trained Cluss in this instance. (Messenger Dep. at 30).

James Baker, on behalf of Cluss, agreed that the footer and foundation should be swept clean prior to applying the TUFF-N-DRI® membrane to the foundation block, and that he did not know whether that had been done in this case. (Baker Dep. at 15). Mr. Baker acknowledged that if the TUFF-N-DRI® membrane is applied improperly, it could fail. (Baker Dep. at 20). While Mr. Baker acknowledged that the membrane should not be sprayed over debris that is stuck to the footer, he noted, however, that there is 2,300 pounds per square inch of pressure in the application of the membrane, which will usually remove any loose debris. (Baker Dep. at 16-17).

Mr. Carpenter testified that he observed an inch to an inch-and-a-half of mortar and dirt between the footer and the foundation blocks at the time the waterproofing was applied. (Carpenter Dep. at 26-28). When Mr. Carpenter asked the installer why he was not cleaning the

walls, the installer replied that they do not have to clean them prior to applying the waterproofing membrane. (Carpenter Dep. at 26-27).

Mr. Baker further explained that the TUFF-N-DRI® membrane is applied to the foundation walls, which dries "immediately," then the WARM-N-DRI® foundation board is applied, which adheres to the tacky membrane and to the foundation wall. The foundation board is intended to protect the concrete-block wall and the TUFF-N-DRI® membrane during backfilling, provide insulation, and provide a permeable drainage blanket to conduct water down the exterior face of the wall to a foundation drain around the perimeter of the footing. (Bragg Report at page 3).

After waiting at least one day but not more than thirty days from the application of the TUFF-N-DRI® system, backfill or gravel is placed against the foundation walls, which protects the foundation boards as well as the French drain system which, if operating properly, directs ground water away from the foundation walls. According to Mr. Baker, the standard amount of gravel used to backfill is between 18-36 inches (up to three feet); however, he explained that the more gravel, the better, because "all the parts of the drain system that moves the water away from the house and down and out the French drains depends on the water moving. And the more gravel you have, the less hydrostatic pressure you get against the house." (Baker Dep. at 22-25). Mr. Baker did not know whether anyone at Cluss or Tremco advised Taylor (A&N Contracting) about waiting at least one day to complete the backfilling, including Mr. Springer, who sold the TUFF-N-DRI® system to Taylor. (Baker Dep. at 22).

2. Excavation and Backfilling

Carpenter removed trees from the site, excavated the footers and foundation, excavated utility lines, connected the water and sewer lines, and performed the rough

backfill. (Carpenter Dep. at 17-19). Mr. Carpenter explained that he placed gravel, mixed with a little bit of dirt, over the two feet of gravel that A&N had placed over the foundation drains, for a total height of "a good six feet" of backfill against the foundation "all the way around the house." (Carpenter Dep. at 19-20). After completing the backfill, Mr. Carpenter also sloped or graded the back yard so that storm water would drain away from the home and constructed a drainage swale to assist with surface water run-off. Mr. Martens testified that he inspected the rear yard after the backfill was completed and in fact observed a slight grade or slope of five (5) degrees away from the home. (G. Martens Dep. at 30-31).

After Carpenter completed the rough grading, the Plaintiffs were to place grass seed and topsoil to complete the job. Ms. Martens explained that there was no final grading of the property at the time they moved in, apparently because they could not afford to do so; and as of March 2, 2007 there had been no final grading of the property. (L. Martens Dep. at 110).

Notably, Mr. Martens admittedly re-graded the back yard in preparation for construction of a back porch. Toward the end of June of 2005, Mr. Martens began digging trenches along the rear foundation wall in order to construct the back porch off the rear doors. (G. Martens Dep. at 49, 68; L. Martens Dep. at 56). He placed a pile of gravel against the rear of the home on July 3, 2005, so that Ms. Martens could carry food to the back yard for an annual family reunion on July 4, 2005. (L. Martens Dep. at 57). In doing so, he eliminated the grading and drainage swale installed by Carpenter.

3.     <u>Water Infiltration into the Basement and Waterproofing System Tests</u>

Plaintiffs moved into the home around May of 2005. (L. Martens Dep. at 56). Plaintiffs first noticed dampness in the basement in or about June of 2005 and thereafter began experiencing water in the basement after each heavy rain. (G. Martens Dep. at 67-68).

On July 22, 2005, after Plaintiffs informed Cluss and Tremco that water was seeping into their basement, Mr. Messenger (Tremco), performed two "flood tests" of the waterproofing at the home with John Springer, a representative of Cluss, present. Mr. Messenger placed a garden hose with running water on the ground near the front right corner of the home and near the side porch on the left side of the home and observed that water did not discharge from the foundation drainage pipes after twenty (20) minutes of water flow. (G. Martens Dep. at 42, 63-64; Messenger Dep. at 43-44; Baker Dep. at 18-19). He also did not observe water seeping into the basement following this twenty-minute test. (G. Martens Dep. at 65; Messenger Dep. at 44).

According to Mr. Martens, Mr. Messenger also drilled a hole into the foundation block near the French doors to see if water was present within the block itself, but no water came out. (G. Martens Dep. at 64). Based on these flood tests, Tremco informed Plaintiffs that the water leakage was not attributable to any failure of the TUFF-N-DRI® system, but was due to the foundation drainage system not functioning. (Messenger Dep at 47).

### 4.     Exterior Conditions and Additional Evidence Regarding Causation

#### a.     Foundation Drains and Downspouts[8]

Mr. Messenger testified that he does not believe that the grading or the backfilling have anything to do with the water leakage, rather, he opined that the TUFF-N-DRI® system was not functioning properly because the foundation drains are not functioning; but he does not know why, because he did not perform any other tests to determine the reason. (Messenger Dep. at 49-51). Indeed, Mr. Messenger conceded that he did not dig around the drains to inspect them, run a camera up the drain to determine if they were clogged or otherwise blocked by any obstruction. (Messenger Dep. at 48). Mr. Martens testified that a Tremco

---

[8] The downspouts were installed upon recommendation by Cluss and/or Tremco by an entity not a party to this lawsuit. (L. Martens Dep. at 18).

representative told him that the TUFF-N-DRI® system should prevent water from coming through even if he did not have French drains along the foundation. (G. Martens Dep. at 44-45).

Mr. Baker explained that the waterproofing board used at Plaintiffs' residence was a three-quarter-inch board which can take 30 gallons of water per hour and drain it to the French drain system, and if everything is working in the system, it should be able to keep the home dry as long as the water does not get behind the board. (Baker Dep. at 20).

Cluss and Tremco also provided the expert report of Richard A. Bragg, Ph.D., P.E., who inspected the Plaintiffs' home and observed evidence of moisture along the rear foundation wall, including both corners. Mr. Bragg opined that the fact that there is moisture passing through the foundation walls from the backfill to the interior of the basement implies that the exterior and interior foundation drains are not functioning properly and without a properly constructed and functioning drain around the exterior perimeter of the footing, the waterproofing system will not be fully successful in preventing water or moisture from entering the basement. (Bragg Report at page 7). Particularly, hydrostatic pressure can build up against the exterior surface of the wall to cause seepage through the foundation board, membrane and wall. (Bragg Report at page 7).

Further, Mr. Bragg opined that the surface drainage around the home is improper. Namely, the downspouts discharge water onto the ground at all four corners adjacent to the foundation walls as wall as into a depressed area, not sloped away from the home. The depression or trench thus ponds precipitation, promoting infiltration of water into the backfill. (Bragg Report at page 8). Mr. Bragg noted that this depression/trench was excavated by Plaintiffs.

With respect to the downspout in the rear right corner of the home (as depicted in photo #7 attached to Mr. Grieco's report), Mr. Grieco agreed that it should be reconstructed to

26

discharge water away from the home, to avoid the increase in lateral pressure of the soil against the foundation walls, which increases correspondingly with an increase in water content in the soil. (Grieco Dep. at 92-93). Mr. Lynch, Plaintiffs' other expert, also agreed that the downspouts "tax" the waterproofing system. (Lynch Dep. at 32, 36).

Carpenter's expert, Victor D. Dozzi, P.E., inspected the Plaintiffs residence to determine if the foundation distress and water leakage were caused by the work performed by Carpenter. Mr. Dozzi attributed the placement of the downspouts, which direct water against the foundation, as a contributing factor to the water leakage. (Dozzi Report at page 4). Mr. Dozzi opined that the interior of the concrete block are damp because of the failure of the foundation drains and the waterproofing system applied to the walls, which in his opinion appears to be defective. (Dozzi Report at page 4-5).

Plaintiffs admit that the exterior foundation drainage system does not function and has never been observed by Plaintiffs to have discharged water away from the foundation. (*See* Joint Concise Statement of Material Facts Regarding Motion for Summary Judgment of Defendant, O.C. Cluss Company, at ¶ 15; G. Martens Dep. at 40-41; L. Martens Dep. at 55). Plaintiffs also admit that the gutters and downspouts installed on the home inappropriately discharge water directly against the foundation instead of discharging water away from the foundation. (*See* Joint Concise Statement of Material Facts Regarding Motion for Summary Judgment of Defendant, Tremco Barrier Solutions, at ¶ 14).

        b.      <u>Backfilling</u>

Mr. Grieco explained that the height of the backfill is limited based on the thickness of the masonry block used for the foundation walls and the height and type of the dwelling. Generally, the backfill behind a 10-inch thick block supporting a conventional

structure should be no greater than five (5) feet; but since this home is lighter than a conventional structure, Mr. Grieco opined that the backfill should have been lower than five (5) feet. (Grieco Dep. at 20, 26, 33, 39, 42-43, 62-65). Included in the areas of excessive backfill is the area where Mr. Martens placed gravel. (Grieco Dep. at 26, 64, 148). Mr. Grieco told Plaintiffs that the backfill "contributes to or exacerbates the lateral soil pressures on the foundation wall, and contributes to some of the inward tension cracks." (Grieco Report, page 3; Grieco Dep. at 75, 148). Mr. Grieco concluded that the foundation walls are unable to fully sustain the lateral pressures to which they have been subjected; but acknowledged that many factors of the foundation construction and backfilling are unknown, since no remedial attempts to remove and inspect the existing backfill have been taken. (G. Martens Dep. at 43, 45).

Mr. Bragg noted that based on the construction photos, the excavation adjacent to the walls was backfilled prior to the installation of the home on top of the walls, but normal construction practice is to delay placement of backfill against the basement walls until after the home has been installed, as the home provides support/bracing for the top of the foundation walls and thereby reduces lateral pressure from the soil applied to the exterior of the walls. By placing the backfill prematurely, it created a loading condition on the walls which results in higher stresses in the mortar joints, particularly at the base of the walls. (Bragg Report at pages 5-6).

Mr. Bragg concluded that the basement walls are reportedly constructed of 12-inch thick concrete block, without grout or steel reinforcement. Based on this size of wall, the maximum silty-clay type backfill height permitted is five (5) feet. Based on Mr. Bragg's observations, the backfill placed by Carpenter is six (6) feet high against the exterior surfaces of the basement walls and thus in violation of the building code. (Bragg Report at page 6).

According to Mr. Dozzi, "[g]ravel backfill exerts minimal lateral pressure on a foundation wall" and "the extra gravel backfill placed by Carpenter would have improved the performance of the foundation drains." (Dozzi Report at 4). He concluded that the backfill placed by Carpenter did not apply excessive pressure to the foundation walls and that Carpenter properly graded the land for drainage before the downspouts were installed. Further, the leveling of the back yard by Mr. Martens and the construction of gravel-filled trenches by him is causing storm water to flow toward the rear of the foundation wall. In sum, Mr. Dozzi concludes that Carpenter is not responsible for the dampness on the interior of the basement walls.

Mr. Martens testified that the Tremco representative told him that he believed that the excavator punched holes in the TUFF-N-DRI® membrane when he backfilled the foundation. (G. Martens Dep. at 42, 65).

      c.    Grading

With respect to the grade of the rear yard, Mr. Grieco noted that Plaintiffs reported that the pile of aggregate shown on photos 7-9 to the Grieco Report "was placed to help divert surface runoff away from the rear wall, where it was causing groundwater infiltration to the basement." Again, Plaintiffs admit that Mr. Martens placed this aggregate there himself. (G. Martens Dep. at 49). Mr. Grieco opined that the exterior grade was not crowned or "turtle backed" about the dwelling, which involves building on a high slope so that surface water flows away from, not toward, the dwelling. (Grieco Report at 2). Plaintiffs' other expert, Mr. Lynch, agreed that the grade of the land improperly directs water toward the home. (Lynch Dep. at 111).

Mr. Grieco also testified that although the pile of aggregate is admittedly above the top of the foundation wall, he denied that such condition alone would cause water to seep into the basement. He explained,

> water coming into that stone would be no different than rain
> impacting the rear wall and flowing down the wall to the area
> you're describing. So if it was constructed to seal the weather
> envelope, then putting that fill there shouldn't affect that.

(Grieco Dep. at 147-48). He later conceded, however, that he does not know whether the waterproofing was properly constructed to seal the water because he did not inspect the condition of the walls behind the backfill. (Grieco Dep. at 148).

Mr. Bragg noted that the ground surface slopes away from the house at the right front and right rear corners, but at the left front and left rear corners, the water discharges onto nearly level ground, with a slight depression in the ground near the left rear corner downspout. (Bragg Report at page 3). According to Mr. Dozzi, the gravel-filled trenches in the back yard now act as a conduit that channels storm water directly against the foundation. (Dozzi Report at page 4-5). Mr. Lynch (Plaintiffs' expert) agreed that the depression created by the trench attracts water toward the home. (Lynch Dep. at 32, 36).

Based on the foregoing evidence, we find that genuine issues of material fact exist with respect to the cause of the water infiltration into the basement, namely whether the waterproofing system and/or its installation was defective, whether the amount, type and manner of backfill were appropriate under the circumstances and performed in a workmanlike manner, whether Cluss and/or Tremco complied with the terms of the written warranty and whether the exceptions or exclusions of the TUFF-N-DRI® warranty apply.

For instance, we note that it was not raining on the day of the test and that twenty minutes of water flow alone may not create a sufficient quantity of water to truly determine whether the

drain is functioning. Indeed, while Mr. Messenger believed that twenty minutes was a sufficient amount of time, we cannot make a credibility determination at this stage of the proceedings. Further, Mr. Messenger conceded that Tremco does not have any specifications or guidelines instructing how long to run water in such a test. (Messenger Dep. at 44-45). Similarly, simply because the Plaintiffs have not observed water discharging from the drain does not necessarily mean that water has never flowed from the drain. We also note that there is an issue of fact involving a credibility determination whether a hole exists in the exterior of the foundation block next to the French doors due to the test performed by Tremco, which could easily be a source of water infiltration since by drilling the hole the TUFF-N-DRI® membrane would necessarily have been punctured. These issues must be resolved by the fact-finder.

## IV.  CONCLUSION

For the reasons stated above, we recommend that the motions for summary judgment filed by the Home Show and Clayton be granted on Plaintiffs' claims and all cross-claims, except that Clayton's request for counsel fees and costs be denied; the motions for summary judgment filed by Cluss and Tremco be denied on all claims and cross-claims; and the motion for summary judgment filed by Carpenter be granted in part and denied in part with respect to Plaintiffs' claims and denied on the cross-claims of Cluss and Tremco.

Dated: February **27**, 2008

Donald E. Ziegler, Special Master